**UNITED STATES of America**

v.

**Charles HARRIS, Appellant in Nos. 73–2041, 2046 and Harold Young.**
**Appeal of Harold E. YOUNG, appellant in Nos. 73–2040, 73–2045.**

**UNITED STATES of America**

v.

**Alvin E. YOUNG, Appellant in No. 73–2043.**

**Appeal of Harvey JOHNSON, Appellant in No. 73–2042.**

**Nos. 73–2040 to 73–2043 and 73–2045, 73–2046.**

United States Court of Appeals, Third Circuit.

Argued April 16, 1974.

Decided May 30, 1974.

Rehearing and Rehearing En Banc Denied July 12, 1974.

Thomas C. Carroll, Defender Assn. of Philadelphia, Philadelphia, Pa., for appellant in No. 73–2042.

Paul Yermish, for appellants in No. 73–2040 and No. 73–2043 and No. 73–2045.

Joseph Alessandroni, Jr., for appellant in No. 73–2041 and No. 73–2046.

Thomas J. McBride, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before BIGGS, ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This opinion disposes of the appeals of four defendants who were convicted, in a consolidated trial also involving one other defendant,[1] of various violations

---

1. We review in this opinion the convictions of Charles Harris, Alvin Young, Harold Young, and Harvey Johnson. The appeal of Robert Green, who was also convicted in the district court, raises a distinct issue and is still pending before this court. James Sim-

of the narcotics laws.[2] The facts of the case are comprehensively set forth in the opinion of the district court denying all of defendants' post-trial motions, 368 F.Supp. 697 (E.D.Pa.1973), and we repeat only those facts necessary to our disposition of these appeals.

The primary contention of the defendants is that they are entitled to new trials because the Government failed to take timely action to correct false testimony of its key witness, Linda Johnson, concerning promises made to her by the Government in exchange for her testimony. Although we agree that the Government's action in this case was improper, we believe that defense counsel waived their objections to the impropriety by consciously failing to take any steps to minimize the resulting prejudice to their clients. We therefore affirm the convictions at issue on this appeal.

The Government's case relied heavily upon the testimony of Linda Johnson (unrelated to defendant Harvey Johnson), an informant and unindicted co-conspirator, who testified under immunity. As noted by the district court, none of the defendants took the stand and "[t]he principal thrust of all de-

fendants was to destroy the credibility of the Government's witnesses and primarily Linda Johnson." 368 F.Supp. at 703. In furtherance of this objective, counsel for the defendants made vigorous efforts to show that Ms. Johnson had been induced to testify for the Government in return for its promise to help her get a reduced sentence on three counts of a state prosecution to which she had previously pled guilty but had not yet been sentenced. The record discloses the following fruits of this effort.[3]

When testimony began on the second day of trial, Ms. Johnson was the first witness. Defense counsel established that she had recently pleaded guilty in state court to assault with intent to kill, possession of heroin with intent to deliver, and possession of narcotics, but that she had not yet been sentenced on these counts. She then denied that the Government had promised her that she "would receive favorable treatment from the [state] court" because of her cooperation with the federal authorities, and she denied that she had been "promised any help" in the state proceeding by the Government.[4]

mons, whose trial was severed from that of the remaining defendants, is not before us on this appeal.

2. All four defendants were convicted of conspiracy to possess with intent to distribute and to distribute heroin in violation of 21 U.S.C. § 846. Additionally, Charles Harris was convicted of possession of heroin with intent to distribute, 21 U.S.C. § 841; Harold Young was convicted of aiding and abetting Charles Harris in the possession of heroin with intent to distribute, 21 U.S.C. § 841 and 18 U.S.C. § 2; Alvin Young was convicted of use of a telephone in facilitating the possession of heroin with intent to distribute by other defendants, 21 U.S.C. §§ 841, 843(b).

3. Defendant Harvey Johnson made a pretrial motion for discovery of any "agreement, understanding or communications made to [Linda] Johnson by any law enforcement agent concerning any benefit, including leniency, concessions or accommodations made to her, in consideration of her cooperation with the Government in this case or any related case."

The Government responded by refusing to supply this information "for the reason that such matters are properly the subject of cross-examination of the witnesses . . . ." The district court denied the motion, and this decision is not contested on appeal.

4. On cross-examination, Linda Johnson testified as follows:

Q. Now, have you been promised by anyone other than the public defender that you would receive favorable treatment from the court in these three cases because you are in fact cooperating with the police and the federal authorities?

A. No.

Q. Is it your testimony that you have not been promised any help in your pending cases by the Government, by the United States Attorney, or by the police?

A. No, the regular cops that I know, they told me they would help me as much as possible, but not because of this case, because I don't think they even know of this case.

On further cross-examination the following day, she stated that she had no "agreement with the . . . U.S. Attorney's office as to what would happen in [her] case," and she stated that she did not expect anyone from the office to appear at her state court sentencing.[5] When counsel for the defense asked her if she had any "agreements or understandings" with the federal authorities with regard to her testimony, the Government counsel first objected on the grounds that the question was "entirely too broad," and then remained silent when the objection was overruled and Ms. Johnson answered in the negative.[6]

On the following day, the fourth day of trial, Officer Beasley testified. He was the police department "contact" with Ms. Johnson. He testified that Mr. McBride, who was the Assistant United States Attorney trying this case, and Mr. Wochok, who was simultaneously serving as Assistant United States Attorney and Assistant District Attorney for Philadelphia, had advised Ms. Johnson to plead guilty to the state charges. Under persistent questioning, however, he refused to state that the two officials had promised to intercede in the state proceeding in exchange for her testimony in the instant case.

At that point, Mr. McBride requested a conference at side-bar. He told the court and counsel for the defense that

> Taras Wochok and I sat down and talked and we sat down and talked with her and it was agreed that she should go and plead guilty and *we would do anything, whatever we could,* to influence the [state] court at the time of sentencing to give her a break for what she has been able to do. [Emphasis supplied.]

Mr. McBride offered to stipulate to this, but the district court, agreeing with defense counsel, stated that "I don't think you can expect these defendants to stipulate to something that is a strong point in their favor, but . . . I think you can get to the point clearly and promptly and unequivocally." The court also stated that in light of what it

---

5. Ms. Johnson further testified:

Q. Now, did you have any agreement with the Marshals or the U.S. Attorney's office as to what would happen in your case?

A. No.

Q. As long as you testified?

A. No.

Q. You have no idea what your sentence will be?

A. No. I haven't even been told I might be sent away.

Q. Do you expect anybody to appear in court on your behalf and testify as to why you shouldn't go to jail?

A. I would like someone to, but if they didn't, that would be all right, too.

Q. You don't expect Mr. McBride or any of his associates to appear in [State] Court, do you?

A. No.

Q. Did any law enforcement agent including a police officer or detective state to you that, "When your case comes up, don't worry about it; we will take care of it"?

A. No.

6. Ms. Johnson testified:

Q. All right. Do you have any *agreements or understanding* with the Federal authorities with regard to your testimony today?

\* \* \* \* \*

Mr. McBride: I object to that, sir, on two grounds:

One, I think she has answered it about a half a dozen times already and I think Mr. Meyers has asked it.

But Number 2, if the Court does feel it should be answered again, I would ask that Mr. Meyers narrow it down. As it stands now, *it is entirely too broad.* "Any understandings or agreements" could encompass a myriad of things to her.

The Court: Well, *that's Mr. Meyers' point. He wants to find that out.* I think it is a little repetitious but I will permit her to answer at this time.

\* \* \* \* \*

A. No.

\* \* \* \* \*

Q. Do you have any agreements or understandings with anyone in the State Government, State authorities [relative to your testimony in court today]?

\* \* \* \* \*

A. No.

[Emphasis supplied.]

termed Mr. McBride's "revelation," it would permit defense counsel to lead witnesses more than they usually might. When defense counsel stated that the Government's conduct was outrageous in not correcting Linda Johnson's testimony concerning the agreement while she was on the stand, the court stated, "If there is any kind of motion you have made, Mr. Carroll, it is denied."

A convicted defendant is entitled to a new trial if he can establish that the Government intentionally or inadvertently failed to correct materially false testimony relevant to the credibility of a key Government witness at the trial, including evidence concerning "any understanding or agreement as to a future prosecution" between the witness and the Government. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1964); United States v. Newman, 476 F.2d 733, 737–738 (3d Cir. 1973); United States v. Kaplan, 470 F.2d 100 (7th Cir. 1972), cert. denied, 410 U.S. 966, 93 S.Ct. 1443, 35 L.Ed.2d 701 (1973).

It is apparent in this case that the Assistant United States Attorney sat silently by while Ms. Johnson gave testimony on cross-examination which at least gave the court and jury an impression directly contrary to what he ultimately stated was the truth concerning his agreement with Ms. Johnson.[7] While she was testifying that she had no "agreements or understandings" with the Government, had not been "promised any help" in her pending cases, and that she did not expect anyone from the Government to appear at her state court sentencing appearance, the U.S. Attorney later admitted that he had promised that "we would do anything, whatever we could" to get her sentence minimized "to give her a break for what she has been able to do."

The Government contends, however, that it had no obligation to "correct" Ms. Johnson's testimony because it believed that she was answering the questions of defense counsel in good faith. It contends that although she was told that her cooperation would be made known to the state court at the time of her sentencing, she was also repeatedly told that "the Government can't promise you anything." Although this latter phrase clearly referred to the Government's inability to promise Ms. Johnson any particular *result* at her sentencing, the Government contends that it was upon this phrase that she relied in good faith to deny, inter alia, that she had any "agreements or understandings" with the Government. Since Ms. Johnson therefore did not have the intent to lie which is necessary for a perjury conviction, the argument runs, the Government had no duty to correct the testimony even if the testimony misled the court, defense counsel, and jury into believing that the Government had not even promised to *help* her at sentencing.

Arguably, of course, Ms. Johnson did not commit perjury by her responses to defense counsel. She might have believed in good faith that "agreements or understandings" only referred to specific promises concerning her sentence, which the Government could not and did not make. She might also have honestly believed, despite the Government's promise as described by the U.S. Attorney, that no one would appear on her behalf at the state proceeding. Finally, the U. S. Attorney's admission could be construed as a promise based solely upon Ms. Johnson's past behavior, "for what she *has been able* to do," and not to be affected by her future testimony in the instant case. Under this interpretation, her testimony would not technically be perjury since she had no intent to lie.

7. We must accept as true the admission of the U. S. Attorney made to the court at side-bar, since he does not deny the truth of this admission on appeal. *See* Giglio v. United States, 405 U.S. at 153. We note, however, that Mr. Wochok, whom he also implicated in the deal with Ms. Johnson, denied under oath that he had agreed to anything. *See* note 9, *infra*.

■ We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination. However, when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury.

These considerations are especially strong in the instant case. Defense counsel were attempting, by phrasing their questions as broadly as possible, to determine whether a prosecution witness had been promised anything in exchange for her testimony. Only the Government knew, by virtue of its former statements to her, that she was likely to narrowly construe the word "promise" to refer only to a promise of a particular sentence in the state proceeding. Defense counsel had every expectation that she would construe the word "promise" in its natural sense to include a promise by the Government to help her in the state proceeding. Under these circumstances, the Government may not sit back and require defense counsel to examine each witness extensively to determine whether that witness has been conditioned by the Government to give any particular word an unusual meaning.

■ Notwithstanding the Government's breach of its duty to disclose a promise made to a Government witness, the convicted defendant is entitled to a new trial only if the false testimony denying the existence of an agreement could "in any reasonable likelihood have affected the judgment of the jury." *Giglio, supra,* 405 U.S. at 154; United States ex rel Dale v. Williams, 459 F.2d 763, 767 (3d Cir. 1972). This factor is dependent upon the relative importance of the witness' testimony to the Government's case. *Id.*

The defendants in this case have met their burden of showing the significance of the Johnson testimony to the Government's case against them. The Government does not seriously dispute the importance of this testimony, and this is confirmed by the testimony described in the district court opinion in this case. *See* 368 F.Supp. at 700–703.[8] Nor do we believe that the impeachment of Ms. Johnson's credibility on other grounds by defense counsel sufficiently mitigated the prejudice to defendants which might have arisen had they been unable to show the agreement made between her and the Government. *See Napue, supra,* 360 U.S. at 270; United States v. Kaplan, *supra,* 470 U.S. at 103.

Had the Government not disclosed the agreement with Ms. Johnson until after the conclusion of the trial, these considerations would impel us to reverse the convictions of the defendants. In the instant case, however, the Government did in fact disclose the existence of the agreement. Although the disclosure was not made in a timely fashion, i.e., while Linda Johnson was still on the stand, the disclosure was made two days later, on the fourth day of the eleven day trial, while the prosecution was still presenting its case in chief

As we have noted, the district judge was quite willing, in light of the belated "revelation" by the Government, to permit defense counsel extra latitude in their conduct of the defense, agreeing

---

8. In moving that the court place Ms. Johnson in protective custody, Mr. McBride stated in an affidavit dated May 26, 1973, (less than a month before the trial began) that "her testimony comprises at least seventy-five per cent of the Government's case."

with defendants that the prosecutor's suggested stipulation was inadequate. The court explicitly told counsel that they would be permitted to ask leading questions concerning the agreement. Additionally, as noted by the district court in its opinion denying defendants a new trial, "Linda Johnson was subject to extensive cross-examination and to recall at any time by defense counsel for the purpose of exploring this alleged agreement and bringing same to the attention of the jury." 368 F.Supp. at 714. Furthermore, there is no doubt that defense counsel could have put Mr. McBride himself on the stand and examined him concerning the agreement, since there is no doubt that the prosecutor "possesse[d] information vital to the defense." *See* United States v. Newman, 476 F.2d 733, 738 (3d Cir. 1973).

Defense counsel, on the other hand, chose to do nothing of the sort. In fact, the record is bare of any effort whatever on their part to disclose to the jury the agreement with Ms. Johnson, acknowledged at side-bar by Mr. McBride. Counsel did not recall Ms. Johnson as a witness and did not call Mr. McBride to testify. This deliberate inaction by defense counsel persisted even after they elicited from Mr. Wochok testimony that he could not say that his state prosecutor's office would not oppose leniency for Ms. Johnson in the state proceeding, in contradiction to the admission by Mr. McBride.[9] The record does not reveal that defendants even submitted to the jury the proffered stipulation by Mr. McBride.

■ We believe that this inactivity by defense counsel following the "revelation" by the Government constitutes a waiver of their right to allege error on appeal. As we have repeatedly stated: " * * * [I]f appellant's counsel was of the opinion that the errors were

prejudicial it was his obligation to interpose a timely objection *and seek corrective action by the Court.* [Citing cases.] He should have taken this course when he learned of the errors, but failed to do so. A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create."

United States v. Chicarelli, 445 F.2d 1111, 1116 (3d Cir. 1971), *quoting from* United States v. Grosso, 358 F.2d 154, 158 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). [Emphasis supplied.]

In this case, counsel did express his indignation at the Government's conduct but made no specific motion. The court stated in reply that "If there is any kind of motion you have made, . . . it is denied." Notwithstanding this cryptic comment, the court had previously expressed to defense counsel a willingness to take remedial action. Defense counsel did nothing to "seek corrective action by the Court" in order to minimize any prejudice to the defense.

■ We do not believe the Government's conduct in this case constituted per se reversible error. Although the judge plays a vital role in the trial of a criminal case, counsel for the parties are also essential components.[9a] They too share in the cause of justice. When error appears in a trial and counsel have opportunity to attempt to eradicate it but choose not to do so, they may not unload the burden of the error upon the trial judge. Defense counsel sat by in this case day after day without making the slightest effort to minimize the prejudice of which they now complain. The Government was slow in correcting the testimony of its key witness. Defense counsel, how-

---

9. Mr. Wochok stated that the only understanding was that "sentence [on the state charges] would be deferred and an opportunity would be given to the Government to explain to the Court the degree of her cooperation."

9a. *See* ABA Standards Relating to the Defense Function § 1.1(a) (Approved Draft 1971).

ever, in the expectation that any ensuing conviction would be reversed, did nothing to take obvious corrective measures. We do not believe they may now profit from their inactivity and contend on appeal that the defendants are entitled to a new trial.[10]

This is not to say that counsel, had they exercised their best efforts, would in all certainty have been able to minimize the prejudice to defendants to such a degree that reversible error could have been eliminated. We recognize the strategic importance to defense counsel of being able to impeach the credibility of a key Government witness while he is still on the stand, rather than by recalling him after the jury has possibly accepted the truthfulness of his statements. We are unable to say, however, that there is *nothing* that defense counsel could have done to overcome or reduce the alleged prejudice so as to secure a fair trial for their clients. Counsel by various defense tactics possibly could have succeeded in so reducing the prejudice to their clients. Had they taken these steps, we would now be in a position to evaluate the presence, if any, of the residual prejudice and its effect upon the fairness of the trial. Absent such effort, we conclude that defendants waived their objections to the possible prejudice from the Government's action.

We find support for this view in United States v. Cerone, 452 F.2d 274 (7th Cir. 1971), cert denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972). In that case defendants contended, inter alia, that they had been prejudiced at trial by the testimony of the United States Attorney, who testified that a key witness had told him that he was afraid of "those fellows," referring to the defendants. The defense contended on appeal that it was prejudiced by the failure of the United States Attorney to identify which, if any, of the defendants the witness had feared. The court held that the defendants "waived that issue by failing either to cross-examine the United States Attorney or to call [the witness] in surrebuttal on that point." 452 F.2d at 288–289. *See also* United States ex rel. Felton v. Rundle, 410 F.2d 1300 (3d Cir. 1969) (en banc), cert. denied, 397 U.S. 993, 90 S.Ct. 1129, 25 L.Ed.2d 400 (1970); United States v. Cook, 432 F.2d 1093, 1100 (7th Cir. 1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971); Bohol v. United States, 227 F.2d 330 (9th Cir. 1955).

---

10. We are aware of Nash v. Illinois, 389 U.S. 906, 88 S.Ct. 222, 19 L.Ed.2d 223 (1967) (opinion by Mr. Justice Fortas, joined by Mr. Chief Justice Warren and Mr. Justice Douglas, dissenting from the denial of certiorari). In that case, the defendant had been convicted of murder largely on the testimony of Triplett, who had denied being promised anything in exchange for his testimony. The prosecutor, knowing this denial was false, said nothing. Later in the trial, defense counsel called Triplett's lawyer as well as the prosecutor, both of whom admitted that Triplett had been promised leniency in exchange for his testimony.

Mr. Justice Fortas, joined by Mr. Chief Justice Warren and Mr. Justice Douglas, stated that he "would grant certiorari and reverse." His first reason for reversing was that the defendant was prejudiced because the subsequent admission "could not adequately overcome the jury's initial impression of the [Triplett] testimony." Our holding in the instant case is fully consistent with this rationale, because defense counsel in *Nash* attempted to reduce the prejudice to their client but arguably failed in this difficult task. We recognize the possible prejudice to defendants in the instant case, but hold that their failure to attempt to overcome the prejudice constitutes a waiver.

Mr. Justice Fortas' second reason for reversing was that "it is by no means clear" that the defendant must show prejudice from such prosecutorial misconduct, "especially in a capital case." To the extent that this means that even in a non-capital case the prosecutor's belated disclosure constitutes per se reversible error despite succeeding inaction by defense counsel, we respectfully disagree. We note further that the prosecutorial misconduct in the instant case was not as offensive as that in *Nash*, where the prosecutor admitted the agreement only when forced to under oath. Here, Mr. McBride voluntarily made the admission before Ms. Johnson's denials of any agreement had been contradicted by any witness.

We have considered the other contentions of the defendants and find them without merit.[11]

The judgments of the district court will be affirmed.

## OPINION SUR PETITION FOR REHEARING

The dissent sur denial of the petition for rehearing would reverse on the ground that the prosecution must inform the fact finder as well as the court and defense counsel of the truth. This requirement appears to have been met in the instant case, however, by the prosecutor's proffered stipulation during the Government's case in chief as to the facts he admitted to the court and to counsel. This stipulation could also have been submitted to the jury if defense counsel so desired.

The dissent views the trial judge's statement that he would deny a defense motion as effectively foreclosing the defendants from any significant means of relief. The trial judge, however, was apparently referring to a motion for mistrial. As we have indicated in our original opinion, he was not precluding the defense from other remedies which were readily available to them.

For an example of measures by defense counsel to reduce prejudice resulting from the prosecution's belated disclosure of a bargain with a key witness, see United States v. Johnson, 487 F.2d 1318, 1322–1324 (5th Cir. 1974), petition for certiorari filed, 42 U.S.L.W. 3542 (U.S. March 26, 1974) (No. 73–1418).

SEITZ, Chief Judge (dissenting sur denial of petitions for rehearing in banc).

I believe that these matters should be reheard by the Court in banc and the judgments of the district court reversed. The disposition of these appeals depends on our resolution of a question I consider to be of exceptional importance within the meaning of Rule 35(a) of the Federal Rules of Appellate Procedure: what is the scope of a federal prosecutor's duty to correct known misstatements of government witnesses?

The prosecutor here knew at the time the testimony was given, on two consecutive days, that it was untrue. His only effort to correct the misstatement was his revelation of the testimony's untruth to the judge and defense counsel out of the jury's presence. Neither the prosecutor nor the district court ever brought the error to the jury's attention.

The panel, however, holds that once defense counsel was aware of the misstatement, responsibility for taking corrective measures was defendants' and their failure to take such corrective measures constituted a waiver of their right to assert this error. Because the prosecutor did not inform defense counsel that the testimony was false until after the witness involved had left the stand and another witness had taken it, defense counsel had no expeditious means of bringing this development to the jury's attention without the court's or the government's assistance. Certainly, the trial judge's statement that he denied any motion defense counsel was making concerning this matter may be viewed as effectively foreclosing any means by which defendants, without a considerable lapse of time and possibly significant injury to the presentation of their case, could have corrected this error.

While I disagree with the panel as to whether the defendants here reasonably could be expected to have corrected the misstatement, that is not what makes this case appropriate for rehearing. The

11. Defendants contend, inter alia, that (1) the district court erred in failing to give an accomplice charge concerning Linda Johnson; (2) the statement by a prosecution witness that he had once arrested one of the five co-defendants was so prejudicial as to warrant a new trial; (3) defendant Harvey Johnson was entitled to a severance of his trial from that of the remaining defendants; (4) a new trial should be granted because the prosecutor allegedly induced a Government witness to violate a sequestration order.

important question is why defendants are required to bring the witness' misstatement to the jury's attention. I believe the panel in placing this burden on defendants was guided by a conception of the defendants' rights and prosecutor's duty that differs fundamentally from my own.

The sole right involved here is defendants' right to a fair trial implicit in the guarantee that no person shall be deprived of liberty without due process. Prosecutors, as well as courts,[1] are under a general duty to insure that criminal defendants enjoy this right. As part of this general duty, and not as independent technical requirements, prosecutors are barred from employing false testimony to obtain convictions, Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and are required, upon request, to make exculpatory evidence available to defendants, Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The prosecutor's " 'responsibility and duty to correct what he knows to be false and elicit the truth,' " Napue v. Illinois, 360 U.S. 264, 270, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), derive from the same source. *Napue* does not permit the prosecutor to fulfill this duty by telling defense counsel that certain testimony was false. The decision requires the prosecutor to correct the error, which can be done only by informing the fact-finder of the truth: the requirement that a prosecutor "elicit the truth" to "correct what he knows to be false" is a meaningless inconsistency unless the prosecutor must elicit the truth before the jury. If he fails to do so to remedy a material statement he knows to be false, the prosecutor has violated his duty to insure defendants a fair trial. I do not see how defense

counsel's failure to correct testimony known to the prosecutor to be false can waive defendants' right to a fair trial; and I find the conclusion of waiver here particularly baffling in light of the established rule that every reasonable presumption should be indulged against waiver of the right to a fair trial, e. g., Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); *cf.* Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The solution reached by the panel encourages game-playing by government attorneys; I would rather we encouraged them to preserve defendants' right to a fair trial.

GIBBONS and WEIS, Circuit Judges, join in this dissent.

—

---

1. By focusing on the prosecutor's duty to assure defendants a fair trial, I do not intend to de-emphasize the court's duty in this regard. The district court had a duty to see that the jury was made aware of the prosecutor's promise to the witness. The initial responsibility for correcting this error, however, was

on the prosecutor, for he, not the judge and not defendants or their counsel, knew when the testimony was given that it was false. The court's failure to fulfill its duty here does not excuse the prosecutor's initial or subsequent dereliction.